UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| L. DWAYNE MARCHBANKS, | § § § § | |
| Plaintiff, | | |
| v. | § § § | CASE NO. 4:15-cv-00178-ALM |
| WILLBROS GROUP, INC. and CHAPMAN CONSTRUCTION COMPANY, L.P., | § § § § | Jury Demanded |
| Defendants. | § | |

## **PLAINTIFF L. DWAYNE MARCHBANKS' FIRST AMENDED COMPLAINT**

Plaintiff L. Dwayne Marchbanks ("Marchbanks" or "Plaintiff") respectfully files this First Amended Complaint against Willbros Group, Inc. ("Willbros") and Chapman Construction Company, L.P. ("Chapman"), and would respectfully show the Court the following:

### **PARTIES**

1. Plaintiff Marchbanks is an individual residing in Collin County, Texas.

2. Defendant Willbros is a national company registered in Delaware, with an address at 777 Main Street, 23rd Floor, Fort Worth, TX 76102, that has already appeared in this action.

3. Defendant Chapman is a Texas entity with an address of 10011 West University, P.O. Box 2880, McKinney, TX 75070, that has already appeared in this action.

### **JURISDICTION**

4. This suit was removed by Defendants from the 366th District Court, Collin County, Texas, under the Employee Retirement Income Security Act of 1974 ("ERISA"), as

amended, 29 U.S.C. § 1001 *et seq*. Until further discovery is completed, Plaintiff cannot agree that this Court has federal question subject matter jurisdiction.

5. Plaintiff's original state court Petition sought relief under Texas law for various causes of action also arising out of Plaintiff's employment relationship with Defendants. Additional state court claims are asserted in this Amended Complaint. In the event this Court determines that Plaintiff is a participant under a legitimate ERISA plan, Plaintiff alternatively seeks to recover payment under an amendment to the alleged plan.

## BACKGROUND

6. Willbros is a publicly traded company providing services to national and global oil and gas industries, and to the utility transmission and distribution industry. Chapman is a division of Willbros and is an electric transmission and substation contractor. On May 11, 2012, in McKinney, Texas, Marchbanks and Chapman entered an Employment Agreement in which Marchbanks was hired as an Executive Vice President of Chapman ("Chapman Employment Agreement"). On July 25, 2012, Marchbanks succeeded John C. Hargrave as President and Chief Executive officer of Chapman. On May 9, 2013, Marchbanks and Chapman entered into an Amendment to the Chapman Employment Agreement (the "Amendment"). The Amendment made compensation changes to Section 1 of the Chapman Employment Agreement, but provided, "Except as amended by this Amendment, the terms of the Original Agreement shall remain in full force and effect."

7. The Amendment provided a Management Incentive Compensation Program ("MICP"). Under the MICP, Marchbanks was to receive a bonus of Willbros Group, Inc. restricted stock and compensation up to $780,000 tied to specific metrics outlined in the Amendment. Marchbanks was in the course of discussing the amount of this bonus when

Willbros advised Marchbanks under the "Involuntary Separation Other Than for Cause" provision of his Chapman Employment Agreement that he was being immediately terminated on December 31, 2014. Marchbanks earned the bonus under the MICP for the 2014 calendar year.

8. Paragraph 2.1 of the Chapman Employment Agreement is entitled "Competition and Confidential Information," and it purports to incorporate by reference certain restrictive covenants contained within another document, the Willbros Group, Inc. 2010 Management Severance Plan for Senior Management ("Willbros MSP"). Marchbanks never received a copy of the Willbros MSP until April 2014, almost two years after he signed the Chapman Employment Agreement, and almost one year after he signed the Amendment.

9. Under the terms of the Willbros MSP, "Participants" agree to specified restrictive covenants described therein relating to confidentiality, non-competition and non-solicitation. Among other things, the Willbros MSP: (a) prohibits Participants from sharing or disseminating confidential and proprietary information; (b) prohibits Participants from competing against Willbros by accepting employment anywhere in the world with a Willbros competitor for one year after the Participant separates from Willbros; and (c) prohibits Participants from soliciting employees and/or clients of Willbros for one year after the Participant separates from Willbros.

10. Under the express terms of the Willbros MSP, an employee shall be entitled to be a Participant in the plan "if the employee is selected for participation by [the Willbros' Board of Directors] and the employee signs an Acceptance of Participation." Receipt of any plan benefits, however, is further contingent on Participant's signing a post separation "Waiver and Release Agreement" which is intended to release Willbros from any claim the

Participant/employee may have against Willbros.

11. When he was hired in May 2012, Marchbanks was neither presented with a copy of the Willbros MSP, nor this Acceptance of Participation. When Marchbanks signed the Amendment on May 9, 2013, he had not signed the Acceptance of Participation. Approximately one year later at the end of May 2014, Marchbanks finally received and signed the Acceptance of Participation.

12. In addition to containing restrictive covenants, the Willbros MSP includes provisions that entitle Participants to a "Severance Benefit" (as therein described), which is payable in addition to earned compensation owed employees under any other "arrangement" with the company.

13. On December 31, 2014, Johnny M. Priest, President, Willbros Utility T & D, 777 Main Street, Ft. Worth, Texas, called Marchbanks and informed him he had been terminated without cause by the Willbros Executive Leadership Team, of which Priest was a member. Priest then emailed Marchbanks advising Marchbanks that "PLEASE TAKE NOTICE that pursuant to Section 3.2 (Early Termination) of the Employment Agreement between you and the Company, dated May 11, 2012, as amended by the Amendment to Employment Agreement between the same parties, dated May 5, 2013 (the "Agreement"), the Company is hereby terminating the Agreement and your employment with the Company as of December 31, 2014. This is an Involuntary Separation from Service of the Executive by action of the Company other than for Cause." The notice of termination also requested Marchbanks to "Note that, per Section 2.1 of the Agreement, Section 2.1 survives the termination of the Agreement." Section 2.1 references the Willbros MSP restrictive covenants.

14. On January 2, 2015, Jennifer Breyer, Chapman's HR Director, sent

Marchbanks a Waiver and Release Agreement (the "Release"), allowing Marchbanks 21 days to accept its terms and seven days to rescind the Release after signing. The Release provided for Marchbanks to receive $386,250.00 in "Severance Compensation" and vesting 17,250 shares of restricted stock to Marchbanks upon his "Termination Date." Marchbanks acknowledged receipt of the Release as requested by Chapman.

15. Before the expiration of the 21 day consideration period contained in the Release and days after receipt of the Release, Marchbanks received an unsolicited telephone call from Dennis Berryhill, Human Resources Director for Willbros. Berryhill advised Marchbanks that he had spoken with Willbros management, specifically Johnny Priest, and offered to release Marchbanks from the covenant not to compete contained in the Willbros MSP if Marchbanks would agree to accept one half of the "Severance Compensation" as a "buy down." Priest is a member of the Willbros Executive Leadership Team which purports to have the authority to amend the MSP. Berryill implied that this "buy down" was a practice used before with individuals accepting participation in the MSP.

16. Marchbanks clarified Berryhill's offer and then decided to accept. A series of emails followed that either represented a contract independent of the MSP or an amendment to the Willbros MSP between Marchbanks and Defendants:

    a. On January 7, 2014, Lori Pinder, a Willbros "Corporate Secretary," emailed Marchbanks concerning his vested stock: "All restrictions on your unvested stock lapsed on 31 December 2014. Please let me know if you want to remit the total taxes by personal check or surrender 6,443 shares to satisfy the payroll tax obligation associated with the vesting." The email included a chart providing the per-share value of the stock on December 31, 2014, and the tax obligation.

  b. On January 8, 2015, Marchbanks responded, "Thanks Lori. I am waiting on a call from Dennis Berryhill to follow up on some past conversations. In the meantime, is there a time frame I need to be sensitive about?"

  c. At 11:02 AM on January 8, 2015, Ms. Pinder emailed Marchbanks: "Hi Dwayne, I need to close the stock books for December, so as soon as possible would be great." At 11:09 AM, Dennis Berryhill wrote Marchbanks: "Dwayne, not sure what else you need from me. Please advise. Lori needs to move forward on your stock. Thanks." At 12:10 PM, Marchbanks responded: "Dennis, the last time we talked, you mentioned discussing an option different from the documents you sent. Is there a time I can call and visit with you." Berryhill then emailed Marchbanks at 12:15 PM, "Yes, you can call my cell 713-859-8758. Settlement negotiations don't affect your stock arrangements with Lori so please proceed ASAP."

  d. Marchbanks called Berryhill, clarifying the offer to release him from the Willbros MSP covenant not to compete in exchange for a reduction of Marchbanks' Severance Payment by one-half. Marchbanks then emailed Berryhill on January 9, 2015, "Dennis, Thanks for clarifying Chapman's offer to lift the covenant not to compete mentioned in the Willbros MSP if I reduce my severance payment to $200,000. I accept that offer. I understand from your email that this acceptance does not affect my vested stock interest. Please let Lori know I'd prefer that the payroll taxes be paid by surrendering the 6,443 shares of stock she referenced in her email."

  e. Berryhill did not immediately respond to this email, but Marchbanks, relying on the email exchange and believing that he was at liberty to seek employment with competitors, explored his employment options. On January 16, 2015, Marchbanks had a conversation with Jennifer Breyer, Chapman's HR Director who had sent him the Release. She

confirmed her awareness that Berryhill had made the offer to release Marchbanks from the covenant not to compete if he would accept one-half of his Severance Payment. Marchbanks then emailed Berryhill: "Dennis, in talking to Jennifer today, she indicated you did not get the email last Friday [January 9, 2015]. Please see below the email I sent." Berryhill responded: "Sorry, Dwayne, I missed the email entirely. I'm glad Jenn called me to check it out. I will redraft the Agreement [the Release]. The actual severance benefit will be $193,125. I will send the document on Monday." Marchbanks responded to this confirmation of the agreement by emailing Berryhill, "Dennis, Thanks for the follow up. You know the math better than I do, so that dollar sum is acceptable."

    f.    This exchange of emails created an enforceable contract either independent of the MSP or as an amendment to the Willbros MSP (the "Email Contract") in which Marchanks agreed to accept $193,125 (one half of his Severance Pay) in consideration for Willbros' agreement to release him from the Willbros MSP covenant not to compete. Relying on Berryhill's representations and the written terms of the electronic communications, Marchbanks accepted other employment.

    g.    Berryhill, acting on behalf of Willbros and Chapman, then attempted to breach the contract by writing on January 23, 2015: "Dwayne, Upon further review of your negotiation to reduce the severance benefit to $200,000 if we lift the restrictive covenant not to compete, Willbros does not agree. Therefore Willbros' retracts its offer to reduce both the non-compete duration and the severance compensation. Please review and execute the Waiver and Release Agreement attached to Willbros' December 31, 2014 termination notice. We agree to grant you an additional twenty-one (21) days from today's date to execute the Agreement. The

Agreement will then become binding and enforceable seven (7) days after receipt from you and upon our signature. Should you have any questions, please let me know."

17. Without regard to the validity of whether a contract or ERISA benefit claim arose from this email exchange, Defendants wrongfully discharged Marchbanks for his refusal to engage in criminal activity related to overstating Chapman revenue projections.

18. On or about September 22, 2014, Marchbanks provided Defendants with his fourth quarter financial projections for Defendant Chapman. These projections, based on the facts reasonably known to Marchbanks at the time, forecast a $1.446 million fourth-quarter loss for Chapman. In response, Defendants, through the Chief Financial Officer of Willbros, UTD, Defendants' Utility Segment, ("the UTD CFO") demanded Marchbanks amend these projections. The CFO stated via email, "[b]reakeven [sic] should be the worst case scenario for Chapman to present to Willbros. Q4 hasn't started yet; therefore, there is time to plan to not lose money. Q4 improvements over draft1 will come either from higher revenues or lower costs."

19. After considering the factors affecting realistic projections, Marchbanks amended his fourth-quarter projections. This amendment, based on changed circumstances and information gleaned from meetings with one of Defendants' largest customers, was still based on the factual realities of Chapman's business prospects. However, Marchbanks' amended projections still forecast a fourth-quarter loss of $567,856. In response to this amendment, the UTD CFO once again demanded more aggressive projections. In an email dated September 25, 2014, the UTD CFO stated, "we can't plan to lose money for Q4."The UTD CFO went on to state that he, with input from Willbros UTD's President ("the UTD President") and others at Willbros, had created a plan that was inconsistent with the fact-based projections provided by Marchbanks. This revised plan, that was not supported by the facts known at the time, showed

$933,000 in additional revenue for November and December 2014 than could be supported by the actual business opportunities known at the time. These new forecasts showed a $365,144 profit for Chapman in the fourth quarter as opposed to the $567,856 loss projected based on the factual circumstances known at the time.

20. In response to Defendant's unilateral decision to alter Chapman's fourth-quarter forecast, Marchbanks informed the UTD CFO and other Willbros executives that he would not alter his projections for Chapman simply because Willbros desired to show a more aggressive forecast. Marchbanks stated that he would always "plan" to show a profit, but such a forecast would always be as factual as possible. Marchbanks specifically said he would not create a forecast in such a way as to "provide false expectations that could be miss leading [sic] to anyone."

21. While these discussions were going on, Willbros executives, including Marchbanks, had been aware that Willbros' second-quarter financial statements would have to be restated to show a $22-$24 million deterioration in its financial position due to overstated financial statements in Willbros' oil and gas segments. Against this backdrop, Defendants demanded, and Marchbanks resisted, an altered fourth-quarter forecast to project numbers that Marchbanks believed were not factually supportable.

22. In October and November 2014, Marchbanks began his initial preparation of Chapman's first-quarter 2015 forecast. Again, this forecast was based on the facts known to Marchbanks and Chapman at the time. However, these projections were not aggressive enough for Defendants. The UTD CFO stated that Willbros' first and second quarters of 2015 would need to be the best it had ever had. Chapman's initial first quarter 2015 forecast did not meet this demand. Despite the need to finalize these forecasts between October of 2014 and the end of the

year, Willbros never discussed the 2015 forecast with Marchbanks again. In prior years, conversations regarding first-quarter forecasts occurred regularly in November and December. Instead, Defendants delayed those discussions until January 2015. In fact, following Marchanks' statement that he would not fabricate financial reports, the UTD CFO's statements regarding Defendant's first and second quarters were the only conversations between Marchbanks and Defendants on financial matters. On December 31, 2014, before further discussions could take place, Defendants suddenly terminated Marchbanks without cause and with no explanation as to the reason for termination.

23. Because of the financial and investment implications of Willbros' restated second-quarter financial statements, Defendants were desperate to show financial strength, even if there was none. Defendants terminated Marchbanks because he refused to meet Defendants' demands to provide aggressive financial forecasts that were not factually supportable. Had Marchbanks agreed to overstate revenue forecasts as directed by Willbros, he could have been subjected to potential criminal prosecution under 18 U.S.C. § 1001, Section 10(b) and Rule 10b-5 of the Securities and Exchange Act of 1934, and other criminal provisions of both state and federal law.

## CLAIMS

24. To the extent necessary, Plaintiff pleads his claims in the alternative.

**Wrongful Termination Pursuant to *Sabine Pilot***

25. Plaintiff incorporates all paragraphs above and below as if fully stated herein.

26. With full knowledge that Willbros had misstated its projected earning for the first two quarters of 2014, Willbros insisted that Marchbanks provide unrealistic revenue forecasts for the fourth quarter 2014 in order to place a more favorable, but inaccurate, spin on Willbros

financial condition. Marchbanks refused. He was then terminated for the sole cause that he refused to commit an illegal act in violation of securities laws.

### Breach of Employment Contract

27.   Plaintiff incorporates all paragraphs above and below as if fully stated herein.

28.   Pleading further and in the alternative, if necessary, Marchbanks is entitled to recover his 2014 bonus. Under the Amendment to the Chapman Employment Agreement, Marchbanks has earned and is entitled to a bonus for the 2014 calendar year. Willbros and/or Chapman have not paid Marchbanks the bonus that he is owed. Willbros and Chapman have breached the Amendment. As a direct and proximate result of this breach, Marchbanks has been damaged and is entitled to recover his actual damages, attorneys' fees, and costs.

### Promissory Estoppel and Breach of Email Severance Contract

29.   Plaintiff incorporates all paragraphs above and below as if fully stated herein.

30.   Defendants initiated negotiations with Marchbanks regarding release from his covenant not to compete. During these negotiations, Berryhill, on behalf of Defendants, promised Marchbanks he would be released from the covenant not to compete in exchange for the payment of $193,125. Marchbanks substantially relied on this promise by seeking out and accepting employment. Given the status of Berryhill's position as Willbros's Director of Human Resources, and his representation that he had already discussed this payment with other Willbros executives, including Johnny Priest, the UTD President, Marchbanks' reliance on these promises was reasonable and foreseeable. Marchbanks relied to his detriment on the contract created by his email exchange with Berryhill. Marchbanks is entitled to recover $193,125 together with interest as allowed by law and his reasonable attorneys' fees. Marchbanks maintains this agreement was independent of his MSP agreement.

**Denial of Benefits Pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B)**

31.     Plaintiff incorporates all paragraphs above and below as if fully stated herein.

32.     Pleading further and in the alternative, if necessary, and in the event the Willbros MSP is found to be an enforceable ERISA plan, Defendants have wrongfully, capriciously, and arbitrarily denied severance benefits to Plaintiff. Plaintiff seeks relief under 29 U.S.C. § 1132(a)(1)(B) to recover the severance benefits agreed to in the Email Contract to the Willbros MSP negotiated between Plaintiff and Berryhill. Defendants, through Berryhill, negotiated the Email Contract with Marchbanks and represented to him that these benefits were payable to him by Defendants. Plaintiff seeks to enforce his rights under the terms of the Willbros MSP, to the extent such an enforcement reflects his entitlement to the full, amended benefits, and to recover attorneys' fees, pre-judgment and post-judgment interest and costs, and all such other relief to which he may be entitled.

**Breach of Fiduciary Duty Pursuant to ERISA, 29 U.S.C. § 1132(a)(3)**

33.     Plaintiff incorporates all paragraphs above and below as if fully stated herein.

34.     Pleading further and in the alternative, if necessary, and in the event the Willbros MSP is found to be an enforceable ERISA plan, Defendants, via the Executive Leadership Team, were plan administrators for the Willbros MSP. As plan administrators, they owed Marchbanks certain fiduciary duties. Chapman and Willbros, through Berryhill and at the direction of the UTD President, were undertaking fiduciary acts while negotiating the Email Contract that amended the Willbros MSP with Marchbanks. An ERISA fiduciary must discharge his duties with respect to a plan solely in the interest of the participants and the beneficiaries. Defendants, through Berryhill and at the direction of the UTD President, breached the fiduciary duties owed to Marchbanks. Defendants represented that they had released

Marchbanks from the Willbros MSP's covenant not to compete and then, after Defendants' proposed release was accepted by Marchbanks, rescinded the Email Contract two weeks later. Whether negotiating in bad faith, conveying an outright falsity, or merely determining that the Email Contract did not benefit Willbros or Chapman, Defendants' actions over that two-week period breached fiduciary duties owed to Marchbanks, including the duty of loyalty.

35. Defendants further breached their fiduciary duties to plan participants and beneficiaries by attempting to revoke the Email Contract with Marchbanks. The Email Contract boils down to a waiver of Marchbanks' covenant not to compete, a term that benefits only Willbros and Chapman, in exchange for a 50 percent reduction in Marchbanks' severance benefit, a term that benefits only the plan and its beneficiaries. In short, by attempting to revoke the Email Contract, Defendants sought to secure a benefit for the company at the expense of the Willbros MSP and its beneficiaries and participants. Defendants, acting as fiduciaries, breached the fiduciary duties owed to Marchbanks and other Willbros MSP beneficiaries.

**Declaratory Judgment**

36. Plaintiff incorporates all paragraphs above and below as if fully stated herein.

37. Pleading further and in the alternative, and in the event the Willbros MSP is found to be an enforceable ERISA plan, an actual, justiciable controversy exists between Marchbanks, and Willbros and Chapman, regarding the respective rights, duties, and obligations of the parties, if any, under the Chapman Employment Agreement, the Amendment, the MICP, and the Email Contract created by Berryhill, pursuant to 28 U.S.C. § 2201.

38. Marchbanks therefore seeks an Order from this Court determining the rights, duties and obligations of the parties under the Chapman Employment Agreement, the

Amendment, the MICP, and the Email Contract created by Berryhill, including the following:

    a. That Berryhill's email exchange with Marchbanks constitutes an enforceable contract with Willbros.

    b. That any covenant not to compete referenced or contained in the Chapman Employment Agreement is unenforceable. A covenant not to compete must be necessary to protect a legitimate business interest of the promisee; supported by consideration; reasonable as to time, territory, and activity limitations, and not injurious to the public. The covenant not to compete is unreasonable in that it is global and prevents Marchbanks from seeking employment anywhere within the oil and gas or utility delivery industries.

    c. The MSP does not constitute a valid ERISA Plan. For example:

        i) The Participants cannot be determined by the terms of the putative plan;

        ii) There is no uniform administration of the putative plan;

        iii) From the surrounding circumstances, a reasonable person cannot ascertain the benefits, beneficiaries, and/or benefits procedure of the putative plan; and

        iv) Plan participation is judicially, not administratively determined.

39. Further, Marchbanks seeks an Order awarding him such other relief as the Court deems proper.

## Damages

40. As a result of the wrongful acts of Defendants, as alleged above, Plaintiff has suffered injuries and actual damages in a sum which is within the minimum jurisdictional

limits of this court, and Plaintiffs seek to recover all such actual damages from Defendants.

41. As a result of the actual, justiciable controversy surrounding the disputed contracts described herein, Plaintiff was required to retain the undersigned counsel to assist him in prosecuting and protecting his rights under the law. Plaintiff seeks to recover his reasonable and necessary attorneys' fees and costs incurred as permitted by law or in equity.

## Conditions Precedent

42. Plaintiff states that all conditions precedent have been performed or occurred herein.

## Jury Demand

43. Plaintiff requests trial by jury and will tender the requisite fee.

WHEREFORE, Plaintiff, Marchbanks, respectfully requests that this Court enter a judgment against Defendants, award Marchbanks his damages, costs and attorneys' fees and to resolve this controversy, grant the declaratory relief requested above regarding the respective rights, duties, and obligations of the parties. Marchbanks further requests the Court to grant any other relief to which he has shown himself justly entitled, whether in law or equity.

*[Remainder of Page Intentionally Left Blank]*

Respectfully submitted,

UNDERWOOD LAW FIRM, P.C.
Kelly Utsinger
State Bar No. 20416500
kelly.utsinger@uwlaw.com
Rick Lambert
State Bar No. 11844725
Rick.Lambert@uwlaw.com
C. Jason Fenton
State Bar No. 24087505
Jason.Fenton@uwlaw.com
500 South Taylor, Suite 1200
P.O. Box 9158
Amarillo, TX 79105
Telephone: (806) 379-0336
Fax: (806) 349-9476
500 North Central Expressway, Suite 175
Plano TX 75074
Telephone: (972) 926-5300


By: _/s/ Kelly Utsinger_____
     Kelly Utsinger

**ATTORNEYS FOR PLAINTIFF**

## **Certificate of Service**

I certify that a copy of this First Amended Complaint was served on all parties on April 29, 2015, through the Court's CM/ECF filing system.

By: _/s/ Kelly Utsinger_____
     Kelly Utsinger